*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARITA GLYNISE TALLEY,

        Defendant-Appellant.

UNPUBLISHED
August 4, 2022

No. 356518
Oakland Circuit Court
LC No. 2018-267313-FC

Before: SHAPIRO, P.J., and RICK and GARRETT, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree premeditated murder, MCL 750.316(1)(a).[1] Defendant moved for a new trial premised on ineffective assistance of counsel, and in support of that claim she moved for *in camera* review of the victim's medical records, which the trial court denied. Defendant filed an interlocutory appeal of that decision, and in lieu of granting her application for leave to appeal, we entered an order peremptorily reversing the trial court.[2] The Supreme Court vacated this Court's order and remanded to us for plenary review.[3] For the reasons stated in this opinion, we now affirm.

## I. BACKGROUND

This case arises from the May 11, 2018 shooting death of William Bell, Jr., at his home in Pontiac, Michigan. The basic facts are as follows. Defendant moved in with Bell in October 2016

---

[1] Defendant was also convicted of one count of unlawful possession of a firearm by a felon (felon-in-possession), MCL 750.224f; and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. She was sentenced to life without parole for the murder conviction.

[2] *People v Talley*, unpublished order of the Court of Appeals, entered April 13, 2021 (Docket No. 356518).

[3] *People v Talley*, ___ Mich ___ (2021) (Docket No. 162974).

when she needed a place to live and at some point, they became romantic partners. Bell's father testified that in May 2018 Bell confided that he no longer wanted to be in a relationship with defendant and that he wanted her to move out, but she did not do so. Bell's brother gave similar testimony about Bell wanting to end his relationship with defendant. Near midnight on May 11, 2018, defendant made a 911 emergency call in which she reported that Bell was dead. In the audio recording of the 911 call that was played for the jury, defendant claimed that Bell had pointed a gun at her and that she had taken it from him and shot him multiple times. The call disconnected and the dispatcher called defendant back. While they were speaking, the dispatcher heard a loud bang. Defendant explained that she thought Bell was reaching for the gun, and so she shot him again.

Police arrived at the scene to find Bell deceased on the couch, in a slumped-seating position with a half-filled, uncapped water bottle between his legs. Officers testified that there was no wetness or spillage from the water bottle on the surrounding area. A TV remote control was tucked under Bell's right leg, there were two shell casings near his buttocks, several shell casings on the floor in front of him, and no signs of struggle in the room. It was determined that Bell was shot 11 times. A toxicology screen showed that Bell had a blood alcohol content of .02 at the time of his death and that there were no drugs, legal or illicit, in his system.

Defendant testified at trial and claimed self-defense. According to defendant, on the night of the killing, she and Bell had purchased a half gallon of vodka, which Bell was drinking fairly heavily. Defendant testified that Bell became rude and broke her phone and then "pulled the gun out" and threatened to kill her. She lunged for the gun and wrestled with Bell on the couch to get control of the gun. She finally got the gun and was walking backward when Bell jumped up toward her, at which point she shot him several times. The prosecution argued that the evidence showed that defendant shot Bell as he sat resting, half-asleep on the couch.

Defendant appealed her convictions to this Court, and we granted her motion to remand for an evidentiary hearing on her claims of ineffective assistance of counsel.[4] Relevant to this appeal, defendant argues that her trial counsel was ineffective for failing to investigate whether the interaction between Bell's seizure medication and his consumption of alcohol could have caused him to act aggressively toward defendant. At trial, Bell's father and brother testified that Bell regularly took seizure medication to control his epilepsy. As noted, however, the medical examiner reported no prescription medications were in Bell's system at the time of his death. On remand, defendant moved the trial court for an *in camera* inspection of Bell's medical records to determine the name of his seizure medication.

As a preliminary step to deciding the motion, the trial court ordered the medical examiner to produce a list of all the medications tested for in the toxicology examination. The court also granted defendant's motion for funds to retain an expert witness regarding the effects of seizure medication. Defendant's expert, Dr. Gerald A. Shiener, reviewed the list of the substances tested for by the medical examiner and reported that there were more than 10 seizure medications available at the time of Bell's death, but the medical examiner only tested for three of them. Dr.

---

[4] *People v Talley*, unpublished order of the Court of Appeals, entered June 17, 2020 (Docket No. 350178).

Shiener stated some of these medications, when mixed with alcohol, can cause aggression. The parties submitted supplemental briefs, and after a hearing the trial court denied the motion for an *in camera* review of Bell's medical records.

## II. ANALYSIS

A trial court's decision regarding a motion for an *in camera* review of records is reviewed for an abuse of discretion. *People v Davis-Christian*, 316 Mich App 204, 207; 891 NW2d 250 (2016). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *People v Jack*, 336 Mich App 316, 321; 970 NW2d 443 (2021) (quotation marks and citation omitted).

Bell's medical records are protected by the physician-patient privilege. See MCL 600.2157. In *People v Stanaway*, 446 Mich 643, 659-650; 521 NW2d 557 (1994), the Supreme Court established the following procedure for when a criminal defendant seeks discovery of privileged material:

> We hold that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an *in camera* review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant.[5]

In the posttrial context, "[e]vidence is material only if there is a reasonable probability that the trial result would have been different, had the evidence been disclosed." *People v Fink*, 456 Mich 449, 454; 574 NW2d 28 (1998).[6]

### A.

A review of the trial testimony regarding Bell's use of prescription seizure medication is necessary for resolution of this issue. Bell's father, William Spencer Bell, Sr., testified that Bell's seizures began when he was about 17 years old. When asked what medications his son was prescribed for the epilepsy, William reported: "It's a common drug for people that have epilepsy or seizures. It's—I can't think of the name, I think it started with an E or something. I don't know." With respect to his son's compliance with taking the medication, William stated:

> I would say almost 99 percent. Occasionally he would forget, because the medication made him a little off balance. They was giving him, in my opinion, too much. And I took him to my MD, and he told him to—he shouldn't take so much. He was sleepy all the time, so.

---

[5] MCR 6.201(C) was amended to incorporate *Stanaway*'s holding. See MCR 6.201(C)(2).

[6] We wish to emphasize that this is not the same standard for pretrial *Stanaway* motions.

When asked by defense counsel whether he thought his son was overmedicated, William responded:

> Well my MD actually took Billy on as a patient later because I was with my MD for almost 20 years. . . . I told him that . . . my son was taking this particular drug and he was taking it three times a day and he slept a lot, he was always sleepy, but he functioned. But he was a little bit loopy sometimes, and he told me if—he said if I was allowed to give him his medication, wouldn't give him that much.

Bell's brother, David Christopher Bell, also testified regarding his knowledge of his brother's medications. David said Bell took medications for his condition, but he did not "recall what they were," just that they were "seizure medication." David had lived with his brother for a time and during that time Bell was "pretty regimented" in taking his medications. There were some side effects to Bell's medications: "He'd get real sleepy and just—he would just go to sleep within a half an hour of taking it; he'd just pass out." David denied that the medications made Bell aggressive or angry.

Defendant also testified that Bell was taking prescription medication for his condition. She said "[a]fter the first six months of me staying there with him, his prescription changed through Henry Ford and they gave him more medication. His medication dosage increased so much that his mood, his demeanor, his attitude, every day it was something different." She further testified that Bell was instructed to gradually reduce his dosage, but that he "kept it at the highest level."

B.

We now apply the *Stanaway* standard to the facts of this case. To begin, we conclude that defendant has established a reasonable probability that Bell's medical records contain information relevant to the defense theory that Bell's consumption of alcohol and seizure medication caused him to become aggressive toward defendant. First, given the trial testimony that Bell had been taking prescribed seizure medication for some time, it is likely that his medical records will contain the name of his prescribed seizure medication. Second, it is also likely that aggression is a known potential side effect of Bell's prescribed medication, as Dr. Shiener averred in his affidavit that this was true for several of the commonly used anti-convulsant medications available to seizure patients in 2018. And considering the trial testimony that Bell regularly took his medication, it is reasonable to infer that he did so on May 11, 2018.

We conclude, however, that defendant fails to establish that the privileged records were *material and necessary* to her defense, i.e., that they would have created a reasonable probability of a different outcome at trial. At most, an expert such as Dr. Shiener could have testified that Bell was on a medication that had the potential to cause aggressive behavior in some patients when mixed with alcohol. In other words, Dr. Shiener would not be able to testify that the combination of the medication and alcohol caused or likely caused Bell to become more aggressive, only that this was a potential side effect. And there was no evidence that his medication, even when mixed with alcohol, had resulted in his becoming aggressive on any prior occasions.

Defendant testified that Bell was physically abusive toward her and that he became aggressive on the night on May 11, 2018, while he was drinking. But the jury did not find

defendant's version of the shooting events credible, and we see no basis to conclude that evidence of a potential side effect of Bell's medication would have likely led the jury to a different result. The most compelling evidence was the crime scene photograph of Bell sitting slumped on the couch with a half-filled water bottle between his legs that had not been spilled. Neither defendant nor her counsel explained how the water bottle was consistent with defendant's testimony that she shot Bell multiple times after he jumped up off the couch toward her. Defendant shot Bell again, presumably for the 11th time, while she was on the phone with 911. Defendant testified that Bell had "got the gun" and was about to shoot her in her back, when she lunged toward him, grabbed the gun, and shot him again. It is difficult to believe that Bell was capable of such an action after being shot 10 times, and again this testimony is completely inconsistent with the uncapped, half-filled water bottle found between Bell's legs.

Defendant's testimony about the events of May 11, 2018, was implausible in other respects. Defendant testified that Bell was "consistently" making alcoholic drinks for himself that night. As noted, however, Bell's blood alcohol content at the time of his death was .02, well below the legal limit of .08. And defendant's testimony that Bell asked her to rack a round into the chamber of his gun that evening is suspect given her testimony that she did not have any experience handling firearms or Bell's weapon. Defendant also testified that Bell told her he was an assaultive person and that he had been in jail several times. But the prosecutor then called Detective Kevin Braddock as a rebuttal witness who testified that he ran CLEMIS and LIEN reports for Bell that produced no results of a criminal history.

In sum, considering the multiple inconsistencies and implausibilities in defendant's testimony, there is not a reasonable probability that the jury would have found her claim of self-defense credible had it been presented with evidence that Bell was taking medication that had the potential to cause aggressive behavior when combined with alcohol. Accordingly, the sought privileged records were not material and necessary to the defense, and the trial court did not abuse its discretion by denying the posttrial motion.[7]

Affirmed.

/s/ Douglas B. Shapiro
/s/ Michelle M. Rick
/s/ Kristina Robinson Garrett

---

[7] Given our resolution, we need not address the prosecution's alternative argument that defendant did not overcome the waiver requirement for absolute privileges.